# EXHIBIT I

# William Marletta Safety Consultants, Inc.

### Dr. William Marletta, Ph. D, CSP

143 Cedar Point Drive
West Islip, NY 11795
Phone: (631) 321-8772
Fax: (631) 321-8773
wmsafetyconsultants.com

April 22, 2019

The Basil Law Group, P.C.
1270 Broadway, Suite 305
New York, NY 10001
(P) 917-512-3066 (F) 831-536-1075


Attn:      Robert J. Basil, Esq.

Re:        Shin, Ed

Dear Mr. Basil:

On July 18, 2017, your office requested that we review materials regarding the accident of Ed Shin; conduct an onsite inspection, formulate professional opinions as to the cause(s); and provide references, codes and other materials that may be relevant in this case.

## INFORMATION PROVIDED

1.     Copy of Certificate of Occupancy

Eating or Drinking Establishment but not dancing with capacity of 200 persons or less- max persons 129

2.     Copy of Payoff Letter from People's United Bank

3.     Copy of Debtor Info (5)

4.     Copy of Prime Title Settlement Services

5.     Copy of New York Commitment for Title Insurance – The Security Title Guarantee Corporation of Baltimore

6.     Copy of ECB vs Premises Through 11/30/2016/ECB Period Ending Date: 11/30/2016 (4)

1

Shin000001

7.    Copy of Judgment Docket & Lein Information

8.    Copy of Tax Search by S.J. Carroll Jr., Inc.

9.  Copy of blueprint

10.   Copy of Water Department Search by S.J. Carroll Jr., Inc.

11.   Copy of Security Title Guarantee Corporation of Baltimore – Municipal, Departmental and Other Informational Searches

12.   Copy of Certificate of Occupancy by S.J. Carroll Jr., Inc.

13.   Copy of Certificate of Occupancy from nyc.gov

14.   Copy of Housing & Building Search by S.J. Carroll Jr., Inc.

15.   Copy of ECB Violation Details from nyc.gov (2)

16.   Copy of Fire Department * City of New York Bureau of Revenue Management – Report and Record Search Request (2)

17.   Copy of Summons by Number (2)

18.   Copy of Highway Search by S.J. Carroll Jr., Inc.

19.   Copy of Emergency Repair Search by S.J. Carroll Jr., Inc.

20.   Copy of Street Report Search by S.J. Carroll Jr., Inc.

21.   Copy of Bankruptcy Search by S.J. Carroll Jr., Inc.

22.   Copy of Patriot Name Search by S.J. Carroll Jr., Inc.

23.   Copy of Title Insurance Closing Invoice by Register Abstract Company, Inc.

24.   Copy of Schedules A & B from First American Title Insurance Company

25.   Copy of letter from Register Abstract Company, Inc.

26.   Copy of blueprint of 154th Street

27.   Copy of Survey Reading from First American Title Insurance Company

28.   Copy of Surveillance Video

29.   NYC Building Records:

Shin000002

**Last Action:** SIGNED OFF 11/21/2014 (X)

**Application approved on:** 11/04/2010

| | | |
|---|---|---|
| **Pre-Filed:** 12/03/2009 | **Building Type:** Other | **Estimated Total Cost:** $23,086.00 |
| **Date Filed:** 12/03/2009 | | **Electronically Filed:** Yes |
| **Fee Structure:** STANDARD | | |

**Review is requested under Building Code:** 1968

TO CHANGE USE OF SECOND FLOOR FROM MUSIC SCHOOL (U.G.9) TO EATING AND DRINKING ESTABLISHMENT (U.G.6

**Occupancy Classification: Existing:** COM - COMMERCIAL BUILDINGS - OLD CODE ☐ Yes ☒ No

**Proposed:** A-2 - ASSEMBLY: EATING & DRINKING ☒ Yes ☐ No

30. Certificate of Occupancy Wall Poster 129 Persons

31. Certificate of Occupancy 1/24/17 A-2 Eating or Drinking Establishment 2008 designations

32. Copy of Deposition of Eric E. Shin taken February 1, 2019.

Mr. Shin is a fifty-four-year-old man, 5'8" weighing approximately 225 pounds at the time of the accident. Mr. Shin testified that he went out to dinner at a restaurant in Fort Lee, NJ on April 21, 2017. Mr. Shin testified that he drank "about five to six shots" of Johnny Walker scotch whiskey with dinner. Mr. Shin testified that he left dinner around 8:00 PM and went straight to a Karaoke bar in Flushing, Queens located around 160 Northern Boulevard (Address is 154-05 Northern Blvd., Queens, NY), arriving around 9:00 PM.

Mr. Shin testified that he'd been to this bar about ten times in the past six years. Mr. Shin testified that he always used the elevator when he visited this bar because "*I'm scared. I don't like the stairway.*" Mr. Shin testified that the Karaoke bar was "*pretty dark*".

Mr. Shin visited a room (Room#2) where he met Mr. Chung Lee, a friend and business acquaintance. Mr. Shin testified that he consumed three to five more shots of Johnny Walker scotch whiskey in less than an hour. Mr. Shin testified that he was mixing one shot of scotch with about six ounces of Coors Light. Mr. Shin testified that he drank a whole bottle of whiskey and five beers by himself (p.31). Mr. Shin testified that he drank more than half of a 75-millimeter bottle of Johnny Walker Blue scotch whiskey (p.74). As to food, Mr. Shin testified "*I like watermelon so I may have had watermelon.*"

Mr. Shin testified that he then visited a second room in the Karaoke bar and "*we drink a lot.*" Mr. Shin testified, "*I was drunk too, and I think we order another two scotch bottles.*" Mr. Shin testified that he entered this room before 11:00 PM.

Shin000003

Mr. Shin testifies that he was in this room with Young Lee right before the incident.  Mr. Shin testified that he remembers an approximately fifteen-minute conversation with Mr. Young Lee in this room and then he remembers nothing. "*Yeah right now I wake up on Sunday* (Note loss of day*) and say 'Why am I here'. I wake up on Sunday in the hospital.*" (Flushing Presbyterian Hospital).

Mr. Shin testifies that he was leaving the Karaoke bar with Mr. John Kim, who was driving him home, around midnight.  Mr. Shin testified that Mr. Kim was not drinking that evening.  Mr. Shin testified that he was standing at the top of the stairs.  Mr. Shin testified that he does not remember anything about the accident, however has seen a video and Mr. Chung Lee, Mr. John Kim and the District Attorney told him what happened.  Mr. Shin said the video showed Mr. Young Lee kick him.  Mr. Shin testified "*because of that kick, I go all the way down.  It was dark there, I think . . . to the bottom of the stairs.*"  When shown a video by defendants' lawyer, Mr. Shin agrees that the video shows him standing one foot on the top landing and his right foot on the first step down.  Mr. Shin agrees the video then shows him falling forward with his arms outstretched like a superman.  Mr. Shin testified, "*No.  I do not remember a handrail there.*"

33.   Videoclip of accident

The video shows Mr. Shin standing one foot on the top landing and his right foot on the first step down leaning with his back on the right descending wall.  The video showed Mr. Young Lee, man with green shirt, kick him.  The video then shows him falling forward with his arms outstretched like superman.  He fell to a lower landing and did a full somersault down the stairs.

**BUILDING RESEARCH**

Building Research was obtained via www.propertyshark.com

Year Constructed: 1938

Property Use Type: Predominant Retail with Other Uses

Property Class: K4 – Store Building

Shin000004

## ONSITE INSPECTION

On August 15, 2017, I conducted an inspection of an interior stairway located at 154-05 Northern Boulevard, Flushing, New York 11354.



The top landing is carpeted and is approximately ninety inches (90") wide. A stairway descends from the left side of the landing; on the right side is a doorway to the commercial establishment.

(Approximately thirty-six inches (36') from the doorway is a small section of walling that sticks out eighteen and one-half of an inch (18 ½")).

Furthermore, the stairway is approximately forty-four inches (44") wide; it is entirely carpeted. Carpeting was adequately secured. The upper stair section is composed of thirteen (13) risers and twelve (12) treads that descend to an intermediate landing, followed by a lower stair with an additional six (6) risers and five (5) treads.

The measurements of only the first 13 risers descending were measured and the results are as follows in the chart below:

| RISERS DESCENDING | RISER MEASUREMENTS |
|---|---|
| 1 | 7 ¾" |
| 2 | 7 ½" |
| 3 | 7 ½" |
| 4 | 7 ½" |
| 5 | 7 5/8" |
| 6 | 7 ¼" |
| 7 | 7 ½" |
| 8 | 7 ¼" |
| 9 | 7 ¼" |
| 10 | 7 ¼" |
| 11 | 7 ½" |
| 12 | 7 ¼" |
| 13 | 7 ¼" |

5

Shin000005

| RISERS DESCENDING | RISER MEASUREMENTS |
|---|---|
| INTERMEDIATE LANDING | |
| 1 | 7 ½" |
| 2 | 7 ¼" |
| 3 | 7 ½" |
| 4 | 7" |

All of the treads have a uniform width of approximately ten and one-half of an inch (10½") with the exception of the bottom tread, which is ten and one-quarter of an inch (10 ¼") wide. The tread nosings are secured to the carpeting; the carpeting is glued over concrete.

In addition, the sloped measurements of the top landing and only two (2) treads descending were measured and the results are as follows in the chart below to be relatively level:

| TREADS DESCENDING | TREAD MEASUREMENTS |
|---|---|
| TOP LANDING | ↑0.5° |
| 1 | ↑0.4° |
| 2 | ↑0.4° |

With that, the intermediate landing is approximately forty-five and one-half of an inch (45½") long. The first (1st) set of steps are furnished with two (2) handrails, both of which are approximately thirty-four inches (34") high. The left descending handrail has a diameter of two inches (2"). It is one and three-quarters of an inch (1 ¾") wide, two inches (2") high, and provides a hand-to-wall clearance of one and three-quarters of an inch (1¾"). Both the intermediate landing and second (2nd) set of steps are furnished with only one (1) handrail on the right descending side.

The ceiling height above the top landing is approximately nine feet and five and one-half of an inch (9' 5 ½") high. Within it are two (2) overhead fluorescent light fixtures with two (2) bulbs. Approximately twelve feet and five inches (12' 5") from the top landing is an additional light fixture. Illumination measurements were taken at the first (1st) tread, with no one present, is substandard at 3.36 foot-candles for a premises used as a Public Place of Assembly for 129 person occupancy. Based on the information provided, Mr. Shin was kicked and fell to the bottom landing.

Shin000006

## DISCUSSION

Public records classify the subject premises as a retail store that was converted into an eating and drinking establishment in 2014; it is my professional opinion with a reasonable degree of certainty as a certified safety professional that the **aforementioned premises is being used as a Public Place of Assembly** and therefore is required to meet the requirements of Industrial Code Rule 36 Places of Public Assembly in addition to other codes.

As extracted from the Labor Law Section 2.:

> *"Definitions"* a *"Public place of Assembly"* shall include *"(1) a theatre..., (3) assembly halls maintained or leased for pecuniary gain where* **one hundred or more persons may assemble for amusement or recreation**, *except (a) halls owned by churches, religious organizations, granges, and public association and free libraries as defined by section 253 of the education law, and (b) hotels having 50 or more rooms"*

Further, the New York State Industrial Code Rule 36 *"Places of Public Assembly"* required:

> *SUBPART 36-2*
> *§36-2.1 [Application.]*
>
> *The provisions of Subpart 36-2 apply to all structures containing or constituting places of public assembly. They are* **applicable to existing and new structures** *unless otherwise herein specifically stated. Certain occupancies are subject to the special requirements of Subpart 36-3.*

**First,** based on the fact that this is a Public Place of Assembly exit, the illumination provided was too low.

Illumination measurements were taken at the first (1st) tread and is substandard at 3.36 foot-candles as **the premises is used as a Public Place of Assembly which would require five (5) foot-candles as opposed to two (2) foot-candles for general building construction.** Night time readings would be the same or lower. The provision of adequate illumination may have helped Mr. Shin recover during his fall.

Further regarding the illumination there are both general building construction requirements and Public Place of Assembly requirements:

The New York City Building Code (1968 to present), Article 6, requires:

> §[C26-605.1] 27-381 Requirements.

Shin000007

(a) *Illumination of at least two foot candles measured at the floor level shall be maintained continuously, during occupancy, in exits* and their access facilities for their full length, at changes in direction in and intersections of corridors, balconies, exit passageways, stairs, ramps, escalators, bridges, tunnels, landings, and platforms.

(c) *Illumination shall be so arranged that the failure of any one light shall not leave the area in darkness.*

§[C26-801.16] 27-540 Exit lighting

*In addition to the requirements of subchapter six of this chapter, lighting shall be provided in the following areas:*

(a) *Safe areas. - Safe areas shall be artificially lighted by electrical means at all times during occupancy of a **place of assembly** so as to provide illumination of at **least five foot candles at the level of the floor and on the surface of all stairs, steps, ramps, and escalators within the safe area.***

In 1991, in the reference text entitled *The Work Environment Volume One, Doan J. Hansen, Ph. D, Editor, Published by Lewis Publishers, William* Marletta Ph. D, CSP, author of the Chapter on *Trip, Slip, and Fall Prevention* wrote on the subject as follows:

> *"Stairs and exits should be well illuminated to allow the pedestrian the opportunity to adequately perceive the step edges as well as identify any possible hazard which can effect his ability to safely transition the stair. Many codes require a minimum illumination of 1 foot-candle at the tread level. Some codes require 5 foot-candles illumination at required exits. These are certainly minimal criteria for the illumination of stairs; however, many stairs fail to provide even these basic requirements. The Society of Illuminating Engineers (IES, 345 East 47th Street, New York, NY) recommends light intensity levels of 10 - 20 foot-candles in stairways. (26) It is recommended that an alternate source of illumination be provided in stairways to help reduce objectionable shadows, which can be cast with some single illumination sources. The quality and character of the light source selected (i.e. direct or indirect) is also an important consideration as direct light can provide strong shadows as opposed to more diffuse illumination sources."*

**These conditions would be dangerous to pedestrian stair users and would not meet safe practice or the standards set by the Illuminating Engineering**

8

Shin000008

Society (IES) requiring a minimum of 10-20 foot-candles as specified by the Lighting Handbook 1981 Application Volume.

**Second,** it is my professional opinion to a reasonable degree of certainty as a certified safety professional that handrails were required on both sides of this stair.

The first (1st) set of steps are furnished with two (2) handrails, both of which are approximately thirty-four inches (34") high. Both the intermediate landing and second (2nd) set of steps are furnished with only one (1) handrail on the right descending side. **Furthermore, the stairway is approximately forty-four inches (44") wide.** The video shows Mr. Shin falling forward with his arms outstretched like a superman.

A properly designed handrail system serves a threefold purpose:

> 1. A handrail will serve as a strong visual cue of the approaching steps;
>
> 2. Is important as it will serve to prevent the occurrence of a slip/misstep;
>
> 3. Provide a means of recovery for the pedestrian once a fall has been initiated.

The American National Standards Institute *Safety Requirements for Floor and Wall Openings, Railings, and Toeboards* (ANSI A12.1-1973) states the following:

> 2. Definitions
>
> handrail. *A single member supported on brackets from a wall or partition, as on a stairway or ramp, to furnish persons with a hold in case of tripping.*
>
> 6. Stair Railings
>
> 6.1 *Every flight of stairs having one or more risers shall be equipped with stair railings or handrails as specified in (1) through (5) below. The width of the stair shall be measured clear of all obstructions except handrails.*
>
> (4) *On stairways 44 inches wide but not exceeding 88 inches wide, one handrail on each enclosed side and one stair railing on each open side provided.*

The Building Laws of the City of New York (1938) states:

> (6.4.1.1). §C26-292.0 Interior required stairs.

9

Shin000009

(6.4.1.12) 1. Hand-rails in required stairways.

1. *Required exit stairs shall have walls or well-secured balustrades or guards on both sides with hand-rails on both sides.*

The New York City Building Code (1968 to present) states:

§[C26-604.8] 27-375 Interior stairs.

(f) Guards and handrails. **Stairs shall have walls, grilles or guards at both sides and shall have handrails at both sides except that stairs less than 44" wide may have a handrail on one side only.**

The 2008 and 2010 NYC Building Code

*1009.11 Handrails.  Stairways shall have handrails on each side.*

*Exceptions….*

*6.      One handrail shall be allowed in enclosed exit stairs less than 44" (1118 mm) wide that do not serve as an accessible means of egress.*

Here, the provision of a single handrail was not permitted.

**Third,** it is my professional opinion with a reasonable degree of certainty as a certified safety professional that a short landing width poses a safety problem creating dangerous and cramped conditions where persons are permitted or expected to congregate.   This creates dangerous conditions for a person descending the stairway, standing on the landing, or entering/ exiting the bar/dance hall.

Crowded conditions with such a short landing will cause loss of proper support where slippage is common.  It can be seen that the top landing was cramped and crowded at the time.  The video shows Mr. Shin standing one foot on the top landing and his right foot on the first step down.  The video then shows him falling forward with his arms outstretched like a superman.  With a maximum capacity of 200 persons, the landing of stair was too small and caused Mr. Shin to stand unstably with one foot on the floor on the landing and one foot on the first step, where he could and was easily pushed down the stairs.

This intermediate landing is approximately forty-five and one-half of an inch (45 ½") long.

The Building Laws of the City of New York (1938) Sub-Article 4, *Required Stairways,* states:

10

Shin000010

Sub-Article 4
Required Stairways

(6.4.1.1). §C26-292.0 Interior stairs.
(6.4.1.6). f. Landings and vertical rise on required means of egress.

1. *The vertical rise of any flight of stairs serving as a required means of egress between floors, landings or platforms, in straight runs of stairs, shall be forty-eight inches or more, except that when stairs are permitted to be three feet wide in accordance with subdivision b of section C26-292.0, such distance shall be forty-two inches more.*

2. *The distance between risers on landings, or platforms, in straight runs of stairs, shall be forty-eight inches or more, except that when stairs are permitted to be three feet wide in accordance with subdivision b of section C26-292.0, such distance shall be forty-two inches more.*

The New York City Building Code (1968 to present) states:

§[C26-604.8] 27-375 Interior Stairs.—Interior stairs shall comply with the following requirements:

(d) Landings and platforms.

(1) *The minimum width of landings and platforms perpendicular to the direction of travel shall be equal to at least the width of the stairs except that on a straight-run stair, the distance between risers of upper and lower flights at intermediate landings or platforms need not to be more than forty-four inches.*

Therefore, the intermediate landing is technically adequate in accordance with this code.

The 2010 NYC Building Code:

*1009.5 Stairway landings. There shall be a floor or landing at the top and bottom of each stairway. The width of landings shall not be less than the width of stairways they serve. Every landing shall have a minimum dimension measured in the direction of travel equal to the width of the stairway. Such dimension need not exceed 48 inches (1219 mm) where the stairway has a straight run…*

The New York State Industrial Code Rule 36 *"Places of Public Assembly"* requires:

(5) Landings.

11

Shin000011

(i) *The vertical distance between landings of required interior stairways hereafter constructed shall not exceed 12 feet 6 inches. The length and width of terminal and intermediate landings shall be at least equal to the width of the stairway in which they occur except that intermediate landings on straight runs need not have a length exceeding 44 inches measured in the direction of the run.*

**Fourth,** it is my professional opinion with a reasonable degree of certainty as a certified safety professional that the risers between the top landings and the intermediate landing are non-uniform, which provides for a tripping/slipping hazard and is contrary from the New York City Building Code, Industrial Code Rule 36, and good and accepted safe practice.  Such design will increase the difficulty in trying to recover or regain footing in a fall or during normal use.

The Building Code of the City of New York (1901), Sec. 108 requires:

*All stairs shall have treads of uniform width and risers of uniform height throughout in each flight.*

The New York City Building Code of 1917 requires:

§153. Interior Stairs

4. Treads and risers. *Treads other than winding treads shall be of uniform width and height in any one flight.*

The Old Building Code of the City of New York (1938) requires:

(6.4.1.1). §C26-292.0 Interior required stairs.

(6.4.1.4) d. *…Risers and treads, other than winding treads, shall be of uniform width and height in any one flight.*

The Building Code of the City of New York (1968 to present) requires:

§[C26-604.8] 27-375 Interior stairs.

(e) Risers and treads.

(2) *Riser height and tread width shall be constant in any flight of stairs from story to story.*

The New York State Industrial Code Rule 36 *"Places of Public Assembly"* requires:

(4) Treads and risers.
(iii) *Between any two landings, the treads shall be of uniform width and **risers of uniform height***

12

Shin000012

This stair system is not uniformly constructed, and significant variance is noted between each riser. The New York City Building Code and safe practice requires that riser heights and tread widths be constant (uniform to within 1/8"). This stair has riser heights which vary between 7 ¼" and 7 ¾". This causes the foot to land further out on the stair tread and/or landing contributing to the likelihood of slippage, loss of balance, and will hinder any possible recovery in the event of a fall.

Furthermore, in John Templer's book entitled, *The Staircase*, he refers to the following:



1.2 *Gait cycle, stair descent, reprinted from Muybridge (1955), 121*

*As we take our first step in descent (fig 1.2), the leading foot swings forward over the nosing edge (swing phase) and stops its forward motion when it is directly over the tread below. As this foot starts its descent, the heel of the rear foot begins to rise from the previous tread (or landing), leaving the weight of the body to be supported on the metatarsal heads of the forward foot (stance phase). At the same time, the rear leg beings to bend at the knee and the hip. In effect, we now commit ourselves to the forward foot and start a controlled fall forward and downward towards the tread. The toe of the forward foot is pointed down somewhat in order to begin to absorb the force of the fall as soon as it makes contact with the tread. The higher the riser is, the more the toe is pointed; the lower the riser is, the more the foot is kept horizontal.*

A strong correlation can be shown between accident stair systems and non-uniform riser heights and tread widths. Non-uniform design of risers and treads are particularly hazardous as the pedestrian expects the next riser and tread to be the same as the one before it. Non-uniformity produces changes to our mental expectation of the riser height and tread width. Minor variations in measurements will also alter the landing position of the ball of the foot. When these changes are not perceived it prevents the necessary changes and

Shin000013

accommodations in the gait, which will increase the risk of slip occurrence and opportunity for recovery.

**Lastly,** it is my professional opinion to a reasonable degree of certainty as a certified safety professional that there was a lack of crowd control at the top of the landing. Congregation of the crowd was permitted to remain on a very tight, cramped, narrow, top landing immediately outside the bar/ eatery. Further, it is clear that there was some type of disorderly activity transpiring on top the landing which should have been rectified by management or others to alleviate such hazardous and dangerous occurrences.

14

Shin000014

## CONCLUSIONS

1. It is my professional opinion with a reasonable degree of certainty as a certified safety professional that the subject premises is classified as a Public Place of Assembly and therefore is required to meet the requirements of Industrial Code Rule 36 Places of Public Assembly in addition to other codes.

2. It is my professional opinion with a reasonable degree of certainty as a certified safety professional that the based on the fact that this is a Public Place of Assembly exit, the illumination provided was too low.

3. It is my professional opinion with a reasonable degree of certainty as a certified safety professional that based on illumination measurements taken at the first (1st) tread and is substandard at 3.36 foot-candles if the premises is used as a Public Place of Assembly which would require 5 foot candles as opposed to two (2) foot-candles for general building construction. Night time readings would be the same or lower.

4. It is my professional opinion to a reasonable degree of certainty as a certified safety professional that handrails were required on both sides of this stair in accordance with The Building Laws of the City of New York and good and accepted safe practice.

5. It is my professional opinion with a reasonable degree of certainty as a certified safety professional that a short landing width poses a safety problem creating dangerous and cramped conditions where persons are permitted or expected to congregate. This creates dangerous conditions for a person descending the stairway, standing on the landing, or entering/ exiting the bar/dance hall.

6. It is my professional opinion to a reasonable degree of certainty as a certified safety professional that there was a lack of crowd control at the top of the landing. Congregation of the crowd was permitted to remain on a very tight, cramped, narrow, top landing immediately outside the bar/ eatery. Further, it is clear that there was some type of disorderly activity transpiring on top the landing which should have been rectified by management or others to alleviate such hazardous and dangerous occurrences.

7. It is my professional opinion with a reasonable degree of certainty as a certified safety professional that based on my review of the stair and understanding of this accident, that these were likely contributing factors to this accident.

*William Marletta*

Dr. William Marletta, Ph. D, CSP

15

Shin000015

# William Marletta Safety Consultants, Inc.

## Dr. William Marletta, Ph. D, CSP, CXLT

143 Cedar Point Drive
West Islip, NY 11795

**Phone:** (631) 321-8772     **Fax:** (631) 321-8773     **E-mail:** Wmarletta1@gmail.com

**EDUCATION:**                                                                                    *Updated 1/3/2018*

Ph. D. in Occupational Safety and Health New York University, New York, NY, 1994
Dissertation *"The Effects of Humidity & Wetness on Pedestrian Slip Resistance . . ."*

M. A. Occupational Health and Safety, January 1985, 3.89 GPA
New York University, New York, New York

A. B. Applied Science - Fire Protection Technology, with Distinction, 4.0 GPA, 1980
Suffolk Community College, Selden, New York

B. A. Biological Sciences, January 1977, 3.29 GPA
Indiana University, Bloomington, Indiana

**PROFESSIONAL HONORS:**

- Certified Safety Professional (CSP) #7214, by exam in Comprehensive Practice, 1984

- *Certified English XL Variable Incidence Tribometrist* (CXLT) (English XL Slip Testing Operators Cert. #F0202-0297)

- New York State Certification #98-0093 *"Certified Safety Consultant"* (CSC) NYS Industrial Code Rule 59

- New York Law Journal *"Best Liability/ Construction Expert"* Voted first recipient of the Award in 2013

- World Recipient of the American Society of Safety Engineers (ASSE) "*Safety Professional of the Year 1996"* Award

- *"Safety Professional of the Year 1991"* (ASSE) Long Island Chapter

- ASSE Worldwide Award *"2009 Bresnahan Medal"*  Recognition for safety standards dev (San Antonio, TX) PDC

- ASTM *"Award of Merit"* (1999) for contributions to the development of Standards

- Slip testing researcher/ consultant with BOT 3000E slip tester; English XL slip tester, Mark II, & HPS slip testers

- Experienced & equipped for slip, roughness; contrast; hardness; illumination; sharp edge; & sharp corner testing

- Author of reference text chapter *"Trip, Slip & Fall Prevention"* & other pubs.  Contributor/ active member for ANSI, ASTM, NFPA, & ASSE standards on slip resistance, snow/ ice, stairs, ramps, mats, ladders

- WABC TV Eyewitness 7 News Consultant Special Report *"Safety & Home Depot"* February 14th, 21st, & 27th, 2001

- WABC TV Eyewitness 7 News, Special Report, Jim Hoffer *"Construction Safety and Alcohol"* November 6th, 2002

- Invited panel expert for TV show season to review inventions *on "All American Makers"*

- Fellow of the ASTM (American Society of Testing and Materials) *"Award of Merit"* presented in 1999

- Chair ASTM F13 Comm *"Safety & Traction for Footwear"* (92-97); Chair *Traction* F13.1 (98-01); VCh F13 (02-05); Officer Member at Large (06-09);  Chair of ASTM Draft Standard Comm F1637-95 *"Safe Walkway Surfaces"*

- ASTM F15 Committee *"Consumer Products Safety Standards"*; C21 *"Ceramics"*;  F06 *"Resilient Floor Coverings"*

- Member of ICC International Code Council (International Building Code) – (Basis for State Building Codes)

- Member of the Underwriters Laboratories UL410 *"Standard for Safety of Slip Resistance of Floor Surface Materials"*

- Member of the Underwriters Laboratories STP 1439 *"Standard for Sharpness on Edges of Equipment"*

- Research Consult to USDOL OSHA/ SENRAC Fed Standard slip resistance of steel & decking in construction

- Consultant to the American Insurance Association (AISG, Inc.) presenter national seminars on  Slip, Trip, & Fall

- Research consultant to Florsheim/ Hi-Test Safety Shoes on slip resistance - Tractional design, composition, COF

- Consultant engaged in research to develop the slip performance standard for NFPA Com (1901) on Fire Trucks

- US Patent 5,768,786 Co inventor of machine guarding brake, w fail safe design, rotating & fixed guard

- Prof Member of the American Society of Safety Engineers # 4706230 (ASSE) 1982 /1986; Pres (ASSE) LI 1993/4;

- Member of American National Standard Institute (ANSI) 1993/ (ANSI *"Board of Standards Review"* 1994-99)

- ANSI A117.1  Standard (Wash, DC) *"Providing Access… & Usability for Physically Handicapped.."* (repr ASSE 97-17)

- Member ANSI A1264.1 *"Workplace Floor & Wall Openings, Stairs, & Railings Systems"/ A1264.2 "Slip Resistance"*

- ASTM  E06.51.25   Fall Protection  Committee on  *"Skylights" (08-15)*

Shin000016

| 11/85 to present | William Marletta, Ph. D, CSP |
| | WILLIAM MARLETTA SAFETY CONSULTANTS |

William Marletta is the principal of a diversified safety consulting firm providing a wide range of safety consulting services to industrial, commercial & construction industries. As a safety consultant, Dr. Marletta is specialized in slip, trip, fall and machine guarding accident prevention. Safety services include safety loss analysis, hazard identification, OSHA type inspections, construction site surveys, accident reconstruction, safety program development and evaluation, and safety training. Dr. Marletta is a safety specialist regarding stairs, ramps, walks, flooring, construction and industry fall protection, ladders, scaffolds, slip resistance testing and evaluation, speed bumps, and similar floor surface transitions providing consultation, expert opinion and/ or testimony.

| 11/85 to 7/90 | VICE PRESIDENT |
| | Technical and Medical Forensic Consultants Inc. |
| | 151 Hempstead Turnpike |
| | West Hempstead, New York 11552 |

Self-employed safety consultant contracted to TMFC as a safety specialist regarding slip, trip, fall, construction site safety and machine guarding accident prevention. Safety specialist regarding stairs, ramps, walks and floor surfaces. Also providing expert opinion and/ or testimony for litigation cases to TMFC clients.

| 11/84 - 11/85 | SENIOR DIRECTOR |
| | Ogden Risk Management Control Services |
| | One Mass Tech Center |
| | East Boston Massachusetts 02128 |

Responsible for the development of a risk management consulting company for a $ 2.4 billion dollar a year diversified conglomerate. Reported directly to a divisional president with responsibility for safety program development encompassing 54 Ogden companies. Specialized experience identifying, evaluating, and controlling slip and fall hazards in major airport operations, food service catering operations, construction site safety, floor and building maintenance services and heavy public exposure areas. Coordinated contract engineering services for over 1000 locations including Allied Maintenance, Progresso, Allied Aviation Services Fueling, Allied Aviation Services, Avondale Shipyards, Ortner Freight Car, Tillie Lewis Foods, and Danly Press.

| 2/83 - 11/84 | REGIONAL TECHNICAL CONSULTANT |
| | Commercial Union Insurance Companies |
| | Wall Street Plaza |
| | New York, New York 10005 |

Responsible for the technical quality all casualty risk control engineering in the Eastern region (7 offices) including construction surveys. Provided consulting in risk management, loss control, safety program development and evaluation. Experienced with large loss investigations, accident reconstruction, hazard identification and control.

| 6/80 - 2/83 | RISK CONTROL ACCOUNT CONSULTANT |
| | Commercial Union Insurance Companies |

Promoted to the company's senior field service position. Primarily functioned as an account coordinator initiating, developing, and monitoring corporate safety and loss control service to national and international accounts.

| 3/78 - 6/80 | SR. REPRESENTATIVE LOSS PREVENTION ENGINEERING |
| | Utica Mutual Insurance Company |
| | 200 Garden City Plaza |
| | Garden City, New York 11530 |

Multi - line commercial insurance loss control inspection servicing with strong concentrations in printers, binderies, schools, fleets and machine shops. Experienced in general liability and fire oriented inspections, hazard identification, accident cause analysis, construction and general industry safety program evaluation. Inspected more than 1500 sites.

| 3/77 - 3/78 | ENGINEERING INSPECTOR |
| | Bowe, Walsh, and Associates - Engineers |
| | 32 North Park Avenue |
| | Bayshore, New York 11706 |

Field Engineering inspector with the consulting engineering firm for the underground construction of the Suffolk County Sewer District. Responsibilities included making recommendations for the improvement of public and crew safety, compliance with OSHA and fire laws, trenching, PPE, fall protection, site safety, barricading, reporting of damages, blueprint design modifications, and the recording of all construction activities.

Shin000017

Effective February 2, 2017

# SCHEDULE OF FEES AND CONDITIONS AGREEMENT

## WILLIAM MARLETTA, Ph.D., CSP
## William Marletta Safety Consultants

143 Cedar Point Drive
West Islip, NY 11795

PH (631)-321-8772             FAX (631)-321-8773             EMAIL: WMarletta@aol.com

A.    WMSC:     This contract is hereby agreed to between parties for all work performed by Dr. William Marletta, Ph.D., CSP; William Marletta Safety Consultants (WMSC); William Marletta, Ph.D., CSP; Dr. Marletta and William Marletta which will also be referred to as "WMSC" for purposes of this document. In addition, this contract will be applicable to the present assignment as well as all future work until revised.    This contract is effective immediately but may be terminated by either party, for whatever reason, at any time, with documented written notice.

B.    RATES:     Expert consulting time (report preparation, analysis, consultations, telephone conferences, interviews, inspection, photography, research, review of materials, testing, preparation, including travel [portal to portal]) will be billed at a rate of $400.00 per hour plus expenses. Any time related to the case or project which is beyond the scope of an initial telephone interview of the consultant may be considered billable time.

C.    RETAINER:    **A minimum fee and retainer of $2000.00** will be required **in advance** for all work and the retainer will be credited against the final bill. A retainer is required prior to any work being initiated.

D.    ESTIMATES: Estimates of time anticipated to be spent will be gladly provided upon request.

E.    BALANCE DUE:    Upon presentation of reports, any balance due must be paid. Past due invoices shall be charged interest at the rate of 1.5% per month (annual rate of 18%) in the State of New York or the legal maximum rate permitted by applicable state law. Client shall also be responsible for collection fees, attorney fees, court fees and other related fees and expenses where collection expenses are incurred for accounts more than 90 days overdue, if incurred. All invoices are due when rendered.

F.    DEPOSITIONS:    A flat rate of $4000.00 for deposition and travel time plus expenses (i.e. air travel, taxi, train, etc.) includes a maximum 10 hours time. Time beyond the 10 hours total including travel is charged at a rate of $400.00 per hour.

G.    DEPOSITION RETAINER: An advance payment of retainer (10) hours, $4000.00, is required at least five working days prior to the deposition which is credited towards the total bill. Prepayment is required for deposition testimony.

H.    DEPOSITION CANCELLATION OR RESCEHDULING   Cancellation or rescheduling of reserved deposition testimony at less than two (2) business days may, at the discretion of WMSC, result in a minimum billing of 2 hours.   Cancellation or rescheduling of deposition testimony at less than one (1) business day, up until 3:30 PM the day before, may at the discretion of WMSC, result in a minimum billing of 5 hours.   Same day cancellation, or cancellation after 3:30 PM the day before, will result in the full day fee of $4000.00. Prepayment is required for all scheduled depositions.

Shin000018

H.  BILLABLE TIME:   Billing is normally made for preparation time, travel time, expenses incurred, time being deposed, waiting time, and time expended to read and correct transcript if required.

I.  COURT TESTIMONY:   **Court room testimony time, travel time and court room waiting time will be charged as a minimum of 10 hours for the first day $4000.00.** (Testimony fee will normally include one hour of telephone preparation time). Cancellation of courtroom testimony at less than two (2) business days will result in a minimum billing of 2 hours.  Cancellation of courtroom testimony at less than one (1) business day, up until 4:30 PM the day before, will result in a minimum billing of 5 hours.  Same day cancellation, or cancellation after 3:30 PM the day before, will result in the full day fee of $4000.00.   Prepayment is required for all courtroom scheduled testimony.

J.  AIR TRAVEL:   Scheduled airtime over two hours and thirty minutes (2:30 minutes one way) shall be business class.  If business class is not available, such travel shall be first class.   Reduced travel rates of $325/hr. may be applied where travel is over 6 hrs for the day.

K.  NAMING FEE.   Clients agree to pay WMSC a naming fee of $2,000.00 if Dr. William Marletta or William Marletta Safety Consultants or any other WMSC consultant's name is used or named as an expert for Client and no other services are performed by WMSC.

L.  EXPENSES:   Reasonable and customary expenses for photography, mileage, parking, tolls, lodging, food, airfare, photograph enlargements, laboratory fees, aerial photography, messenger services, etc. will be billed as expenses in addition to the hourly consulting rates, if applicable to the assignment.  Such expenses are normally billed at standard or customary rates with no markup by WMSC.

M.  RUSH ASSIGNMENTS:   WMSC reserves the right to apply time and a half charges (or double time under more unusual circumstance) to the work and travel rates where weekend, evening, early morning, vacation, or holiday work is required due to RUSH circumstances or evening work imposed upon WMSC by the clients special request to adhere to deadlines or other circumstances outside the control of WMSC.  These RUSH rates shall not be applied to the client in circumstances where the work could reasonably have been performed by WMSC during normal business hours or daytime hours where standard rates apply.

N.  SUBPEONA:  If WMSC conducts services for any entity or person, even under any type of subpoena or order, the terms of this agreement shall also apply to that additional consultative or other work. Subpoena's received from an adversary party, for example, which requires work on the part of the expert is the client's responsibility, if no other agreement is established in writing.  Clients guarantee to pay all fees, including attorney fees & travel fees, which that entity or person incurs in accordance with the fee arrangement described above in connection with the expert's response to a subpoena.

O.  EVENING/ EARLY MORNING INSPECTIONS/ HOLIDAYS/ WEEKENDS:  Inspections or other work conducted after or before regular business hours (where necessitated due to special circumstance) may be charged at a rate of time and a half at the discretion of WMSC.  HOLIDAYS/ WEEKENDS may be charged at double time.

P.  RATE CHANGES:   Client agrees to the terms and conditions of this agreement, for this and all future work assigned to William Marletta Safety Consultants, unless otherwise

2

Shin000019

stipulated between parties. It is hereby agreed that the client will adhere to normal, routine, periodic rate increases, which may be applied no more than annually to the present rate charged, not to exceed 10% increase per year (usually less, if any) during the term of work performed. In addition, the client agrees to adhere to any future changes in WMSC's schedule of fees, for additional work which may be applied later in the case, unless other arrangements are formally stipulated between the parties.

Q.   HOLD HARMLESS/INDEMNITY PROVISIONS.      Clients agree to hold Dr. William Marletta, Ph. D, CSP, (WMSC) and any of its representatives, harmless for and indemnify against any decisions made by Clients in reliance upon information, materials, statements, etc., either provided by or not provided by WMSC or any of its representatives. In the event Client brings a lawsuit against WMSC and/or any of its representatives, Clients agree to hold WMSC and/or any of its representatives harmless for and indemnify against any costs and/or fees incurred (court, travel, lost time, etc.,) whatsoever with defending the lawsuit.

R.   CONTRACT VENUE.      All parties hereby agree that the venue for any disputes regarding this this contract shall be Suffolk County, or other venue chosen by WMSC, and shall be governed by the Laws of the State of New York unless otherwise agreed upon in writing by WMSC.

S.   ABILITY.      Clients agree that they have reviewed and investigated the contracted expert and that the Client has determined that the expert has the level of expertise required for the work to be performed. Clients hereby confirm that they have performed a high level of due diligence in the review of all of the qualifications and background of the contracted expert in order to insure that the expert has expertise acceptable for the work and that the expert is fully qualified to fully perform as an expert. It is hereby agreed that WMSC makes no promises or guarantees as to the outcome of work or legal proceeding involved and it is understood that past performance does not guarantee continued success.

T.   OFFICE PROPERTY.      All documents, files or other papers or materials prepared by WMSC or by anyone at the direction of WMSC, in the pursuance of matters of the Clients, remain the property of WMSC. In the event of a termination of employment, WMSC will make available such documents for copying at Client's expense, upon reasonable notice.

U.   WITHDRAWAL      It is hereby agreed that WMSC reserves the right to exclude or remove our self from a case or assignment at any time, or for any reason, but particularly for the failure of a client to keep their account current. Such extreme measures will only be incurred after the client has been given reasonable written notice of the intent of the expert to withdraw from case. It is hereby agreed that under such conditions adversary parties may be advised by WMSC of our decision to voluntarily be removed from the case.

V.   CHECKS:      Checks can be made payable to William Marletta Ph.D., CSP.; Dr. William Marletta; or William Marletta Safety Consultants. (EIN# is 26-4498102)

CASE NAME: _Edward Shin Investigation (No FILED Action)_

_THE BASIL LAW GROUP P.C._
NAME OF FIRM

_R J Basil_
CLIENT'S SIGNATURE
ROBERT J BASIL

_7/10/2017_
DATE

3

Shin000020

# *William Marletta Ph.D., CSP, CXLT, CSC*      *rev. 2/1/17*

*SAFETY CONSULTANT*
143 Cedar Point Drive
West Islip, New York 11795

PHONE:  631-321-8772      FAX:  631-321-8773      WEB: wmsafetyconsultants.com
EMAIL:   Wmarletta@aol.com

**EDUCATION:**
Ph. D. in Occupational Safety and Health New York University, New York, NY, 1994
Dissertation *"The Effects of Humidity & Wetness on Pedestrian Slip Resistance . . ."*

M. A. Occupational Health and Safety, January 1985, 3.89 GPA
New York University, New York, New York

A. B. Applied Science - Fire Protection Technology, with Distinction, 4.0 GPA, 1980
Suffolk Community College, Selden, New York

B. A. Biological Sciences, January 1977, 3.29 GPA
Indiana University, Bloomington, Indiana

**PROFESSIONAL HONORS:**
- Certified Safety Professional (CSP) #7214, by exam in Comprehensive Practice, 1984

- *Certified English XL Variable Incidence Tribometrist* (CXLT) (English XL Slip Testing Operators Cert. #F0202-0297)

- New York State Certification #98-0093 *"Certified Safety Consultant"* (CSC) NYS Industrial Code Rule 59

- New York Law Journal *"Best Liability/ Construction Expert"* Voted first recipient of the Award in 2013

- World Recipient of the American Society of Safety Engineers (ASSE) *"Safety Professional of the Year 1996"* Award

- *"Safety Professional of the Year 1991"* (ASSE) Long Island Chapter

- ASSE Worldwide Award *"2009 Bresnahan Medal"* Recognition for safety standards dev (San Antonio, TX) PDC

- ASTM *"Award of Merit"* (1999) for contributions to the development of Standards

- Slip testing researcher/ consultant with BOT 3000E slip tester; English XL slip tester, Mark II, & HPS slip testers

- Experienced & equipped for slip, roughness; contrast; hardness; illumination; sharp edge; & sharp corner testing

- Author of reference text chapter *"Trip, Slip & Fall Prevention"* & other pubs incl ANSI, ASTM, NFPA, & ASSE safety standards on slip resistance, snow/ ice, stairs, ramps, mats, ladders, handrails, skylights, & other safety

- WABC TV Eyewitness 7 News Consultant Special Report *"Safety & Home Depot"* February 14ᵗʰ, 21ˢᵗ, & 27ᵗʰ, 2001

- WABC TV Eyewitness 7 News, Special Report, Jim Hoffer *"Construction Safety and Alcohol"* November 6ᵗʰ, 2002

- Invited panel expert for TV show season to review inventions *on "All American Makers"*

- Fellow of the ASTM (American Society of Testing and Materials) *"Award of Merit"* presented in 1999

- Chair ASTM F13 Comm *"Safety & Traction for Footwear"* (92-97); Chair *Traction* F13.1 (98-01); VCh F13 (02-05); Officer Member at Large (06-09); Chair of ASTM Draft Standard Comm F1637-95 *"Safe Walkway Surfaces"*

- ASTM F15 Committee *"Consumer Products Safety Standards"*; C21 *"Ceramics"*; F06 *"Resilient Floor Coverings"*

- Member of ICC International Code Council (International Building Code) – (Basis for State Building Codes)

- Member of the Underwriters Laboratories UL410 *"Standard for Safety of Slip Resistance of Floor Surface Materials"*

- Member of the Underwriters Laboratories STP 1439 *"Standard for Sharpness on Edges of Equipment"*

- Research Consult to USDOL OSHA/ SENRAC Fed Standard slip resistance of steel & decking in construction

- Consultant to the American Insurance Association (AISG, Inc.) presenter national seminars on Slip, Trip, & Fall

- Research consultant to Florsheim/Hi-Test Safety Shoes on slip resistance - Tractional design, composition, COF

- Consultant engaged in research to develop the slip performance standard for NFPA Com (1901) on Fire Trucks

- US Patent 5,768,786 Co inventor of machine guarding brake, w fail safe design, rotating & fixed guard

- Prof Member of the American Society of Safety Engineers # 4706230 (ASSE) 1982 /1986; Pres (ASSE) LI 1993/4;

- Member of American National Standard Institute (ANSI) 1993/ (ANSI *"Board of Standards Review"* 1994-99)

- ANSI A117.1 Standard (Wash, DC) *"Providing Access… & Usability for Physically Handicapped.."* (repr ASSE 97-17)

- Member ANSI A1264.1 *"Workplace Floor & Wall Openings, Stairs, & Railings Systems"*/ A1264.2 *"Slip Resistance"*

- ASTM E06.51.25 Fall Protection Committee on *"Skylights"* (08-15)

Shin000021

**WORK EXPERIENCE:**

11/85 to present

William Marletta, Ph. D, CSP
WILLIAM MARLETTA SAFETY CONSULTANTS

William Marletta is the principal of a diversified safety consulting firm providing a wide range of safety consulting services to industrial, commercial & construction industries. As a safety consultant, Dr. Marletta is specialized in slip, trip, fall and machine guarding accident prevention. Safety services include safety loss analysis, hazard identification, OSHA type inspections, construction site surveys, accident reconstruction, safety program development and evaluation, and safety training. Dr. Marletta is a safety specialist regarding stairs, ramps, walks, flooring, construction and industry fall protection, ladders, scaffolds, slip resistance testing and evaluation, speed bumps, and similar floor surface transitions providing consultation, expert opinion and/ or testimony.

11/85 to 7/90

VICE PRESIDENT
Technical and Medical Forensic Consultants Inc.
151 Hempstead Turnpike
West Hempstead, New York 11552

Self-employed safety consultant contracted to TMFC as a safety specialist regarding slip, trip, fall, construction site safety and machine guarding accident prevention. Safety specialist regarding stairs, ramps, walks and floor surfaces. Also providing expert opinion and/ or testimony for litigation cases to TMFC clients.

11/84 - 11/85

SENIOR DIRECTOR
Ogden Risk Management Control Services
One Mass Tech Center
East Boston Massachusetts 02128

Responsible for the development of a risk management consulting company for a $ 2.4 billion dollar a year diversified conglomerate. Reported directly to a divisional president with responsibility for safety program development encompassing 54 Ogden companies. Specialized experience identifying, evaluating, and controlling slip and fall hazards in major airport operations, food service catering operations, construction site safety, floor and building maintenance services and heavy public exposure areas. Coordinated contract engineering services for over 1000 locations including Allied Maintenance, Progresso, Allied Aviation Services Fueling, Allied Aviation Services, Avondale Shipyards, Ortner Freight Car, Tillie Lewis Foods, and Danly Press.

2/83 - 11/84

REGIONAL TECHNICAL CONSULTANT
Commercial Union Insurance Companies
Wall Street Plaza
New York, New York 10005

Responsible for the technical quality all casualty risk control engineering in the Eastern region (7 offices) including construction surveys. Provided consulting in risk management, loss control, safety program development and evaluation. Experienced with large loss investigations, accident reconstruction, hazard identification and control.

6/80 - 2/83

RISK CONTROL ACCOUNT CONSULTANT
Commercial Union Insurance Companies

Promoted to the company's senior field service position. Primarily functioned as an account coordinator initiating, developing, and monitoring corporate safety and loss control service to national and international accounts.

3/78 - 6/80

SR. REPRESENTATIVE LOSS PREVENTION ENGINEERING
Utica Mutual Insurance Company
200 Garden City Plaza
Garden City, New York 11530

Multi - line commercial insurance loss control inspection servicing with strong concentrations in printers, binderies, schools, fleets and machine shops. Experienced in general liability and fire oriented inspections, hazard identification, accident cause analysis, construction and general industry safety program evaluation. Inspected more than 1500 sites.

3/77 - 3/78

ENGINEERING INSPECTOR
Bowe, Walsh, and Associates - Engineers
32 North Park Avenue
Bayshore, New York 11706

Field Engineering inspector with the consulting engineering firm for the underground construction of the Suffolk County Sewer District. Responsibilities included making recommendations for the improvement of public and crew safety, compliance with OSHA and fire laws, trenching, PPE, fall protection, site safety, barricading, reporting of damages, blueprint design modifications, and the recording of all construction activities.

Shin000022